**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**NORYBELL BAEZ DAVID**,
    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL
SECURITY**,
    Defendant.

Civil No. 21-1612 (BJM)

## OPINION & ORDER

Norybell Baez David ("Baez") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that she is not entitled to benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Baez contends that the Administrative Law Judge ("ALJ") wrongly determined her HIV was not severe, failed to adequately address conflicting evidence regarding Baez's health conditions, and determined her Residual Functional Capacity ("RFC") without substantial evidence. Docket No. ("Dkt.") 19. The Commissioner opposed. Dkt. 20. This case is before me by consent of the parties. Dkts. 5, 7. For the reasons set forth below, the Commissioner's decision is **AFFIMRED**.

## APPLICABLE LEGAL STANDARDS

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health &*

*Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At Step One, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At Step Two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At Step Three, the

Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1 (the "Listings"), which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to Step Four, through which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final Step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At Steps One through Four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under Step Five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Sec'y of Health & Hum. Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

# BACKGROUND

The following facts are drawn from the transcript ("Tr.") of the record of proceedings.

## *Medical History*

### INSPIRA

Baez received mental health treatment at Inspira from May 18, 2017 until June 6, 2019. At her initial evaluation, she reported deep sadness, insomnia, restlessness, and an excessive appetite. Tr. 97. Though she had these symptoms for several months, they apparently worsened due to her grandmother's death in May 2017 and her brother's ongoing battle with cancer. Tr. 97. She stated her mental health negatively affected her physical health and her ability to complete household chores. Tr. 98. She was diagnosed with a major depressive disorder, recurrent, severe, without psychotic features. Tr. 99–100. In July 2017, Baez reported she felt the same as she did in May and her original diagnosis accordingly remained unchanged. Tr. 102–103. She was further diagnosed with a mood disorder with depressive features that was due to her known physiological condition. Tr. 107. At a follow-up appointment in February 2018, Baez reported sadness, fatigue, low self-esteem, and constantly crying. Tr. 110. Her diagnoses remained the same. Tr. 109. At appointments in May and August of 2018, she reported that she felt stable while taking her medications, though her diagnoses remained unchanged. Tr. 113–15, 119–120. In November 2018, Baez again reported sadness, fatigue, low self-esteem, and constant crying and her diagnoses remained the same. Tr. 145–46. In January 2019, she had similar symptoms as well as anxiety and constant tension. Tr. 148. Otherwise, she appeared stable under her current treatment plan and did not show any adverse effects. *Id.* In April, she showed signs of sadness, fatigue, irritability, anxiety, poor impulse control, and insomnia. Tr. 152. She reported her treatment with medications was going well, but that she was tired of having the same problems. *Id.* In June, she stated she continued

to be stable with her treatment and she showed no symptoms of depression, anxiety, impulsiveness, or insomnia. Tr. 201–02. In September, she stated she felt well while following her treatment plan, but still showed signs of sadness, fatigue, irritability, anxiety, poor impulse control, and insomnia. Tr. 205. In December, she stated she continued to be stable with treatment and showed none of the symptoms reported in September. Tr. 209.

### Dr. Rafael Caballero Torres - Otolaryngologist

In March 2018, Baez was referred to Dr. Caballero Torres regarding a lump on her head. Tr. 163. In April, Dr. Caballero Torres diagnosed her with a scalp nodule and recommended an incision and removal as well as a biopsy. Tr 162. On October 19, 2018, Dr. Caballero Torres performed this surgery at Hospital Menonita Guayama. Tr. 118. Upon discharge, Baez was found to be alert and well-oriented with an excellent prognosis. Tr. 117.

### Centro de Terapia Física de Juana Díaz

In May 2019, Dr. Luis Garcia Lopez diagnosed Baez with right patellar femoral syndrome and osteoarthritis. Tr. 169. On May 1, Baez stated she felt better than before, but that her knee sometimes gets stuck. *Id.* Her flexion was 90 degrees. Tr. 574. She also reported hip pain, had mild swelling, and walked with a minimal antalgic pattern. *Id.* Dr. Garcia Lopez planned for 10 treatment sessions to help remedy the problem. *Id.* Baez reported feeling better at a follow-up evaluation on May 28, although her knee occasionally got stuck, and her flexion had improved to 125 degrees. Tr. 170.

### MedCentro

Baez received treatment at MedCentro from August to November 2019. Tr. 171–200. In August, she attended a medical appointment and mentioned having no discomfort at the time. Tr. 193. She reported no physical symptoms, and none were observed. Tr. 193–94. She was observed

to be 25 pounds overweight, Tr. 196, but otherwise in good health. Tr. 193–97. In September, she visited MedCentro reporting pain in her entire body. Tr. 179. She was observed to have a normal physical appearance, though she was obese. Tr. 179–80. 185. She was told ways to improve her diet in incorporate exercise into her life. Tr. 185. Further, she had myopia and astigmatism in her eyes, nonrheumatic mitral prolapse, hypertension, high cholesterol, and HIV. Tr. 186. In October, Dr. Germán Chaves conducted a CT scan of Baez's spine and left hip. Tr. 176. The scan showed a normal bone density and low risk of fracture. *Id.* On November 14, Baez reported severe pain at a medical exam and was referred to a nutritionist and mental health professional. Tr. 174–75. The following day, she had a routine medical exam during which she reported no complaints. Tr. 171. The provider, Dr. Zaskia M. Rodríguez, observed that Baez's general appearance was normal. Tr. 172–73. However, Baez was given dietary guidance and a referral for a mammogram. Tr. 173. In December 2019, she had a cardiac consultation in which she reported chest pain, palpitations, shortness of breath, dizziness, giddiness, headaches, muscle cramps, anxiety, panic attacks, stress, depression, and insomnia. Tr. 198–99. She was diagnosed with a cardiac murmur. Tr. 199.

**State Medical Doctors - Dr. Jose Rabelo, M.D. and Dr. Pedro Nieves, M.D.**

On November 1, 2018, Dr. Rabelo evaluated Baez as part of her application for benefits and completed a Disability Determination Explanation. Tr. 214–26. Dr. Rabelo determined Baez had asymptomatic HIV, peripheral neuropathy, and depressive, bipolar, and related disorders. Tr. 221. However, he found the Listing 12.04 criteria were not satisfied. *Id.* He explained that there was no evidence of psychiatric hospitalizations, Baez appeared alert, well-oriented, without auditory or visual hallucination, not suicidal or homicidal, and with preserved attention and concentration. *Id.* Further, he found she could complete daily living activities and had no limitations in social interactions. *Id.* Dr. Rabelo determined that at least one of Baez's medically

determinable impairments could reasonably produce the pain she described. Tr. 222. Further, he found she could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand and walk about six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and push or pull an unlimited amount subject to her limitations for lifting and carrying. Tr. 223. Additionally, Baez could frequently climb ramps and stairs; climb ladders, ropes, and scaffolds; balance; stoop; kneel; crouch; and crawl. Tr. 223. She had no manipulative, visual, communicative, or environmental limitations. Tr. 223. Further, Dr. Rabelo found Baez's cardio-pulmonary exam was unremarkable, her extremities and knee exams were normal, and her hand dexterity and gait were normal. Tr. 224. Dr. Rabelo found Baez had a 3-degree levescoliosis, but her back had otherwise normal bone structures. *Id.* Further, though Baez had small bone spurs in her patella, there was no evidence of suprapatellar effusion, no marginal spurs or calcifications, and no fractures or dislocations. *Id.* Dr. Rabelo found Baez had no history of severe weight loss or anemia and concluded that no listing level was met or equaled. *Id.* As such, Dr. Rabelo, and disability adjudicator Marian Vega-Ortega, determined Baez was not disabled. Tr. 225–26. Dr. Pedro Nieves later reviewed Dr. Rabelo's findings and adopted them as written. Tr. 244.

***Procedural History***

On November 10, 2020, Baez appeared at a hearing before an ALJ. Tr. 40. She testified that she previously worked as a grill worker at McDonald's, but was transferred to a janitor position due to her scoliosis, knee pain, and high blood pressure. Tr. 45–46. She then left her job at McDonald's to take care of her dad who died in February 2020. Tr. 46. Though Baez's dad lived with her, Baez's sister cooked for him, cleaned most of the home, helped their dad groom himself and move around the house, and paid the bills. Tr. 46–47. Baez mainly watched their father to make sure he wouldn't fall. Tr. 47. She stated she had difficulty walking for the past two years and

could not walk more than two hours without feeling pain and swelling in her knees, ankles, and hips due to osteoarthritis. Tr. 48–49. She explained she mopped her house while sitting in a chair because walking was so difficult. Tr. 48. Additionally, she stated she felt pain in her entire back due to bone spurs. Tr. 49. Further, she stated she experienced muscle pain, swelling, and migraine headaches due to noise and light. Tr. 49. As a result of these symptoms, she spent most of her time lying down. Tr. 49. She testified she experienced migraine headaches three times per week for the last two years. Tr. 49. She stated she took prescription medication, Fioricet, when she began to feel head pain, but that she must shut herself inside a dark room for approximately two hours until the medicine takes effect. Tr. 49–51.

When asked about her HIV medication, Baez stated she stopped taking Genvoya due to side effects and instead took Triumeq. Tr. 52. She said Genvoya caused tingling and numbness in her legs and was taken off the market because it caused bone damage. Tr. 52–53. However, she stated that Triumeq caused her to feel weak and fatigued, but that she could not continue switching medications due to allergies. Tr. 53. She further testified her HIV medication caused fatigue, swelling in her joints, headaches, nausea, and heartburn, although she did not state which medications caused which symptoms. Tr. 55.

Regarding her knee, Baez testified her right knee feels weak and suddenly moves while she is walking or standing. Tr. 54. As a result, she cannot crawl, crouch, or kneel without help. *Id.* Though she had received therapy for this problem, Baez said it did not help much. *Id.* She further testified that her back pain radiated through her leg. *Id.* As a result, she said she cannot stoop, put shoes on, wear dresses that button in the back, or crouch to put on pants without help. Tr. 54–55.

As for her mental health, Baez testified she suffered from anxiety and depression. Tr. 55. She stated she would start crying and not know why. *Id.* She also would feel pressure in her chest

as if "something was going to happen" and get anxiety attacks. *Id.* During this time, she was unable to sleep due to pain and often felt irritable or upset for no reason. *Id.* She further testified she would lose track of what she was doing or saying and that her memory would go blank. Tr. 56.

A Vocational Expert ("VE"), Alina Kurtanich, also testified. Tr. 57. She classified Baez's previous job at McDonalds as a janitor, DOT 382-664-010, because Baez only worked on the grill for two months before being moved to the janitor position due to her medical conditions. Tr. 57–58. The ALJ then asked the VE whether someone could work as a janitor if they could lift or carry 50 lbs. occasionally and 25 lbs. frequently, stand and walk approximately six hours in an eight-hour day and sit approximately six hours in an eight-hour day, push and pull the same as they could lift and carry, occasionally kneel and crouch, work at a site with moderate noise intensity, and not drive commercial motor vehicles. Tr. 58. The VE responded that such a person could not work as a janitor. *Id.* However, assuming such a person had a 12th grade education, was approximately 51 years old, and had Baez's work experience, the VE concluded that person could work as a laundry worker, marker, and hospital cleaner. *Id.*

The ALJ then asked the VE to consider another hypothetical person. Tr. 58–59. This person could lift and carry 20 lbs. occasionally and 10 lbs. frequently, stand or walk approximately six hours in an eight-hour day and sit for approximately six hours in an eight-hour day, and push and pull as much as she can lift and carry. *Id.* Further, this person could occasionally climb stairs and ramps, occasionally climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. Tr. 59. Additionally, she could work at a place with moderate noise, occasionally work with dangerous machinery with moving mechanical parts, occasionally work in unprotected heights, and should not drive commercial motor vehicles. *Id.* The VE stated a person with these limitations could not work as a janitor, but could work as a marker, garment sorter, or

mail clerk. *Id.* Baez's attorney then asked the VE whether someone could perform any job if they had no transferable skills, were limited to sedentary work, and were unable to stoop, kneel, crouch, crawl, or lift more than 10 lbs. Tr. 60. The VE responded that such a person could perform some light positions. *Id.* Baez's attorney then asked whether Vocational Rule 201.2 would apply, given Baez's age, and the VE stated that was a matter for the ALJ to decide. *Id.*

The ALJ announced her decision on November 30, 2020. Tr. 15. At Step One, the ALJ found that Baez had not engaged in substantial gainful activity since the alleged onset date, January 31, 2018. Tr. 24. At Step Two, the ALJ found Baez had severe impairments of headaches, degenerative joint disease of the knees, and peripheral neuropathy. Tr. 24. The ALJ evaluated Baez's mental condition using the Paragraph B criteria. Tr. 25. Regarding the four functional areas under Paragraph B, the ALJ found that Baez had mild limitations when it came to understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. Tr. 25–26. The ALJ observed that Baez's treatment notes never noted a significant memory deficit, described Baez as cooperative, indicated she could read and watch tv, described her as fully oriented and with adequate concentration, and showed she had appropriate grooming and hygiene. *Id.* The ALJ then summarized Baez's treatment history and stated she found persuasive the opinions of Drs. Carlos Jusino-Berrios and Wanda Machado indicating Baez had mild limitations under the Paragraph B criteria because her depressive disorder remained stable with medication. Tr. 27.

At Step Three, the ALJ found that Baez's impairments did not meet or equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* She considered Baez's degenerative joint disease in her knees under Section 1.02, but found that medical evidence did not indicate an inability to ambulate effectively due to Baez's knee condition because the

consultant internist found Baez had normal strength in her lower extremities and had normal gait. *Id.* The ALJ then considered Section 14.09, but found it was not satisfied because a consultant internist reported Baez had normal gait and, though a physical therapist found Baez had antalgic gait, this condition improved with treatment. *Id.* She considered Baez's headaches under SSR 19-4p and 11.02 because a primary headache disorder may medically equal a listing either alone or in combination with another impairment. *Id.* The ALJ stated Listing 11.02 requires dyscognitive seizures occurring at least every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment and marked limitation in one area of functioning. *Id.* The ALJ evaluated the areas of functioning under 11.02 using the same physical and mental health analyses discussed above and determined that Baez's headaches imposed moderate physical limitations and mild mental functioning limitations. *Id.* Thus, she found SSR 19-4p and Listing 11-02 not satisfied. *Id.* The ALJ then considered Baez's peripheral neuropathy under Section 11.14 and stated Baez had no limitations in physical functioning because the consultant internist found she had no sensory deficits in her extremities, and she had a normal gait and hand functions. Tr. 28.

At Step Four, the ALJ found Baez retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b),4 except she could: (1) occasionally kneel, crouch, climb ramps and stairs, balance, stoop, and crawl; (2) occasionally work with hazardous machines with external moving parts; (3) occasionally work in high exposed places; (4) work in a moderate noise intensity environment; and (5) not drive commercial motor vehicles. *Id.* She stated that Baez's medically determinable impairments could be expected to cause symptoms, but not to the extent described by Baez. Tr. 30. The ALJ determined Baez's HIV and arterial hypertension were stable with prescribed medication and her knee arthritis had not worsened into a disabling limitation. *Id.* Additionally, the ALJ reviewed her findings, discussed above, that Baez had a normal gait and

mild mental limitations. Tr. 31. Thus, she found Baez had no physical limitations preventing her from working. *Id.* She considered persuasive Drs. Rabelo and Nieves's opinions that Baez could lift, carry, push, and pull 50 pounds occasionally and 25 pounds frequently in addition to sitting, standing, and walking about six hours in an eight-hour workday. *Id.* However, the ALJ further limited Baez to light work because of her allegations of pain due to headaches and prescribed medication. *Id.* The ALJ determined Baez was unable to perform her past relevant work because it required medium exertion beyond her RFC. *Id.* At Step Five, after relying on VE testimony, the ALJ found that that, given her RFC and vocational characteristics, Baez could perform alternative work that existed in significant numbers in the national economy as a marker, garment sorter, and mail clerk. Tr. 32–33. Accordingly, the ALJ found Baez was not disabled under the Act. Tr. 33.

 The Appeals Council denied review, Tr. 1, and this action followed.

## DISCUSSION

 Baez contests the ALJ's findings at Steps Two through Four. Dkt. 19. At Step Two, she argues the ALJ incorrectly found that her HIV and mental impairment were non-severe. Dkt. 19 at 12–13. At Step Three, Baez contends the ALJ failed to support her finding that Baez's headaches did not meet Listing 11.02 with sufficient medical evidence. Dkt. 19 at 10–11. At Step Four, she argues the ALJ determined Baez could perform light work with additional limitations, but did not explain what those limitations were, leading to the implied conclusion that Baez could not perform such work. Dkt. 19 at 14–15. I address each argument below.

### A.  Step Two

 Baez argues the ALJ wrongly determined her HIV was not severe because the ALJ described it as asymptomatic and controlled by prescribed medication. Dkt. 19 at 13. This, Baez contends, ignores various side effects of her medication described in her testimony. Dkt. 19 at 13.

Baez testified she first took Genvoya, which caused edemas on her legs, numbness, nerve damage, and bone damage before she switched to Triumeg, which causes her weakness and fatigue. Dkt. 19 at 13. Baez further testified that Genvoya was taken off the market due to its severe side effects. Dkt. 19 at 13. The Commissioner contends Baez was stable on medication and that the ALJ properly considered her side effects. Dkt. 20 at 7–8, 18, 20. Regarding her mental health, Baez argues the ALJ gave persuasive weight to evaluations by two state doctors, without sufficient explanation, while ignoring evaluations by her treating doctors. Tr. Dkt. 19 at 15–16. I address both arguments below.

### HIV Severity and Side Effects

Baez first contests the ALJ's description of her HIV as "asymptomatic." In her February 2018 HIV questionnaire, Baez stated that Genvoya caused neuropathy, or pain in her extremities. Tr. 82. She also said her condition kept her from working because it made her depressed and caused fungi in her mouth and skin as well as ear infections. Tr. 83. She added that she cannot complete tasks because she gets tired, has trouble remembering verbal instructions, and has diarrhea daily. Tr. 82. Though she stated she could make sandwiches and salads and wash clothes, she noted she needs assistance to make more complicated meals and complete more difficult chores. Tr. 80. As part of this report, Dr. Gladys Sepulveda determined Baez could work around the house for one to two hours, but was unable to walk well, and she could sit or stand for two hours. Tr. 85. In February 2018, her viral load was listed as 1096. *Id.* In March 2019, it had improved to 541. Tr. 515. The ALJ further observed that Baez's CD4 in November 2018 and March 2019 were within normal limits, Tr. 516, 519, and a laboratory report in May 2019 showed CD4 of 772, which is within the normal range. Tr. 621. Further, laboratory report in September 2019 was nonreactive for HIV. Tr.

586. Lastly, the ALJ noted Baez had not required any hospitalization due to complications associated to her HIV. Tr. 24.

The ALJ is not required to take the claimant's assertions of pain at face value. *Bianchi v. Sec'y of Health & Hum. Servs.*, 764 F.2d 44, 45 (1st Cir. 1985). Though Baez takes issue with the ALJ's description of her HIV as "asymptomatic," this description is lifted from Dr. Rabelo's Disability Determination Explanation which was affirmed upon reconsideration by Dr. Nieves. Tr. 221, 240. The ALJ is entitled to credit their classification of Baez's condition where, as here, the ALJ cited the lab reports discussed above as evidence supporting that classification. Thus, the description of Baez's HIV as "asymptomatic" does not warrant remand.

Baez also argues the ALJ ignored the side effects of her HIV medication when evaluating the severity of her condition. Baez reported further side effects from Genvoya beyond the pain in extremities she listed in February 2018. Tr. 82. In her November 2018 disability report, she listed heartburn as a side effect of taking Genvoya. Tr. 390. In December 2018, she stated she suffered from joint pain as a side effect of Genvoya. Tr. 94. She also reported she could only lift about 10 pounds due to her pain, could only walk for approximately 20 minutes, and could pay attention only for 30 minutes. Tr. 92. Her October 2019 disability report again listed heartburn as a side effect of taking Genvoya. Tr. 415.

As mentioned, the ALJ can look to the record for documentation of Baez's side effects. *Bianchi*, 764 F.2d at 45. The ALJ noted Dr. Nilma E. Rosado-Villanueva, the consultant internist, found Baez had dozens of tiny hypopigmented skin areas on both legs, legs pitting edema grade I, and palpable crepitus on the right knee motion. Tr. 30. She also found Baez had a diminished range of motion in her hips, knees flexion, shoulders flexion and abduction. *Id.* However, she reported Baez had normal strength at the upper and lower extremities and normal sensory and reflex

systems. *Id.* Dr. Rosado-Villanueva also found that Baez had normal gait. *Id.* Radiological studies of the lumbosacral spine showed 3-degree levoscoliosis and x-rays of the knees revealed small bone spurs in the patella bilaterally. *Id.* Dr. Rosado-Villanueva reported that Baez presented an unassisted gait and could sit, stand, and get up or down from examination table with no evident difficulty. Tr. 30. A physical therapist, Awilda Vazquez-Quintana, evaluated Baez and found that she presented moderate edema at the right knee, flexion of 90 degrees and knee crepitans. Tr. 574. She noted that Baez ambulated with an antalgic gait. *Id.* Ms. Vazquez-Quintana recommended physical therapy three times per week and exercises. *Id.* At a follow-up visit, Baez reported improved symptoms, but stated her knee would lock occasionally. Tr. 575. Her flexion had improved to 125 degrees, and she presented mild edema and minimal antalgic gait. *Id.* Baez reported pain in her whole body at follow up visits in September and November 2019, but her physical examinations at those appointments were normal. Tr. 579, 584–85. The ALJ found that Baez testified her legs felt better after switching from Genvoya to Tirumeq. Tr. 30. Further, though Baez reported her knee gave out, the ALJ noted the consultant internist did not find any gait disturbance and the attending therapist reported the claimant presented a mild antalgic gait. Tr. 31. Because the ALJ cited examined various sources throughout the record supporting her conclusion that Baez's side effects were mild, substantial evidence supports the ALJ's conclusion that those side effects did not affect Baez's ability to work. As such, the ALJ's evaluation of Baez's side effects from HIV medication, including her knee and joint pain, does not warrant remand.

### *Severity of Mental Health Condition*

Regarding her mental health, Baez argues the ALJ inappropriately gave persuasive weight to evaluations from state doctors Carlos Jusino-Berrios and Wanda Camacho-Machado without any explanation beyond "boilerplate" language. Dkt. 19 at 15. The Commissioner responds that

the ALJ appropriately evaluated Baez's mental condition, citing substantial evidence, and reasonably found persuasive the medical reports by Drs. Jusino-Berrios and Camacho-Machado. Dkt. 20 at 9–11. The ALJ evaluated Baez's mental health using four functional areas, known as the Paragraph B criteria. *See* 20 CFR Subpt. P. App. 1 § 12.00. Drs. Jusino-Berrios and Machado reviewed Baez's record and concluded she had no more than mild mental limitations in any of the four functional areas. Tr. 221-22, 240-42. As such, they concluded Baez's mental conditions were non-severe. *Id.* The ALJ reviewed Baez's mental health history finding that doctors noted no memory deficits and described her as cooperative, fully oriented, and with adequate concentration. For her part, Baez reported no problems getting along with people; she watched television and read regularly; and she could shower, dress herself, feed herself, manage money, shop for groceries, take medications, and complete household chores. Tr. 25–26. Given this analysis, the ALJ went beyond boilerplate language in explaining her decision and Baez's argument to the contrary does not warrant remand.

Additionally, Baez asserts the ALJ failed to explain the conflicting mental health evaluations of Dr. Daniel Rodriguez-Aponte and Dr. Anel Espada-Echevarria who evaluated Baez on the same day. Dkt. 19 at 16. Both doctors evaluated Baez on February 20, 2018. Tr. 108–112. The Commissioner argues that, because these two doctor's mental status findings were not medical opinions, as defined by the Act, the ALJ was not required to evaluate their persuasiveness. Dkt. 20 at 13. "A medical opinion is a statement from a medical source about what [a claimant] can still do despite [her] impairment(s) and whether [she] ha[s] one or more impairment-related limitations or restrictions" on her ability to work. 20 C.F.R. § 404.1513(a)(2). Among other things, this would include statements addressing a claimant's ability to perform mental tasks like "understanding;

remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting." *Id.*

During a mental examination, Dr. Espada-Echevarria found Baez to have good hygiene, adequate behavior, a euthymic mood, adequate affect, clear speech, orientation in person, time, and place, no perceptual disturbances, adequate attention and concentration, and immediate memory. Tr. 108. Dr. Rodriguez-Aponte found Baez to have good hygiene, organized behavior, a depressed mood, restricted affect, clear speech, orientation in person, time, and place, no perceptual disturbances, adequate attention and concentration, and good memory. Tr. 110–11. Additionally, Dr. Rodriguez-Aponte observed psychomotor retardation, a cooperative attitude, worries about daily life, adequate judgment, and adequate insight.

Contrary to the Commissioner's contention, these evaluations do address Baez's ability to meet the mental demands of work. Both evaluations discuss her ability to remember, concentrate, and respond appropriately to people. They are thus statements from a medical source about what Baez could do despite her impairments and the ALJ was required to evaluate their persuasiveness. However, it is unclear how these evaluations could lead to a different outcome for Baez. In their only statements addressing the Paragraph B criteria, both doctors found Baez had adequate memory, concentration, attention, and behavior. Thus, even if the ALJ weighed these opinions, they would not have led to a finding of disability. A harmless error does not warrant remand. *Flood v. Colvin*, 2016 WL 6500641, at *1 (1st Cir. Oct. 20, 2016). Because the ALJ's failure to evaluate the persuasiveness of these medical opinions was a harmless error, the ALJ's Step-Two finding that Baez did not meet the paragraph B criteria is **AFFIRMED**.

### Step Three

Baez contends the ALJ disregarded her testimony that she has migraines at least three times each week and instead found she experienced them three times per year. Dkt. 19 at 10. Further, she contends the ALJ did not cite any medical opinion to support this contrary conclusion. Dkt. 19 at 11. The Commissioner argues the ALJ explained in her Step-Four evaluation that Baez told Dr. Nilma E. Rosado-Villanueva she only had headaches two to three times per year and that Dr. Rosado-Villanueva found Baez had full muscle strength, normal reflexes, intact sensation, and a normal gait. Dkt. 20 at 14–15. The Commissioner argues this analysis is sufficient. Dkt. 20 at 15.

The ALJ, not this court, is charged with resolving conflicts in the record. *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018). "[E]ven if the record arguably could justify a different conclusion," the court must affirm "so long as [the Commissioner's decision] is supported by substantial evidence." *Evangelista, v. Secretary of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987) (citation omitted). An ALJ's cursory analysis may be supported by discussion elsewhere in the opinion. *Alvarez-Roman v. Comm'r of Soc. Sec.*, 2021 WL 4083362, at *6 (D.P.R. Sept. 8, 2021).

Baez did tell Dr. Rosado-Villanueva she had headaches only two to three times per year. Tr. 496. The ALJ also stated Baez testified her headache symptoms improved when she switched from Fioricet to Dologesic. Tr. 30. Though the transcript does not mention Dolgoesic in Baez's testimony, the ALJ and Baez had the following exchange in their discussion of Fioricet:

ALJ:   So, [the Medcenter] doctor also prescribes you Fioricet?

Baez:  That doctor, he has me on acetaminophen, I also have it, I have two because Fioricet is also very strong, sometimes I use it [INAUDIBLE 00:21:23] also, so I use it, depending on—I have two medications.

ALJ:   And you don't use Fioricet a lot then?

> Baez:   I do use it, but it's controlled, and no—I don't use it, only with a few of
> them, I use it, but the other one is better, the pain [INAUDIBLE 00:21:50]
> I alternate them.

Tr. 52. Though various portions of this exchange are described as inaudible, it is clear from the transcript that Baez testified her headache symptoms improved when she began alternating between taking Fioricet and another medication. Though it is unclear that Dolgoesic is the medication that helped Baez, that is irrelevant. Even if another medication, not Dolgoesic, led to Baez's improvement, the ALJ's error would ultimately be harmless.

The Commissioner asserts Baez relies solely on her own testimony that her migraines required isolation at least three times per week, while objective evidence supports the ALJ's conclusion that they occur just two to three times per year. Dkt. 20 at 15–16. The objective evidence the Commissioner cites is Baez's own statements both at the hearing and to Dr. Rosado-Villanueva. The ALJ, not this court, must resolve conflicts between Baez's statements. *Purdy*, 887 F.3d at 13. Baez told Dr. Rosado-Villanueva that she had headaches two to three times a year. She further testified that her headaches improved when she began alternating between Fioricet and another medication. Though Baez also testified she had headaches two to three times per week, the ALJ was entitled to determine how to resolve the conflict between Baez's testimony and her prior statements. Even if Baez's wishes the ALJ explained her resolution of this conflict more thoroughly, the ALJ's determination is nevertheless supported by substantial evidence because it is based on Baez's statements to a doctor and her testimony that her headaches were improving.

Because the ALJ's failure to account for gaps in the hearing transcript is harmless, and her determination regarding the frequency of Baez's headaches is supported by substantial evidence, the ALJ's Step-Three determination is **AFFIRMED**.

### Step Four

Baez argues the ALJ found Drs. Jose Rabelo and Pedro Nieves's opinions that Baez could perform medium work to be persuasive without any analysis. Dkt. 19 at 14. Additionally, she asserts, the ALJ stated Baez could only perform light work with additional limitations but failed to describe those limitations. Dkt. 19 at 14. This, Baez argues, leads to the conclusion that Baez cannot perform light work and can only perform sedentary work. Dkt. 19 at 14. The Commissioner contends the ALJ reasonably relied on Drs. Rabelo and Dr Nieves's findings and her departures from those findings favored Baez. Dkt. 20 at 18. The Commissioner argues those findings were reliable at the time they were made, but that the overall record showed Baez needed further restrictions. Dkt. 20 at 18. Further, the Commissioner states the ALJ did specify the additional limitations she imposed on her finding that Baez could complete light work. Dkt. 20 at 22.

The ALJ said she considered Drs. Rabelo and Nieves's evaluations to be persuasive and consistent with the record at the time they were given. Tr. 31. The Commissioner is correct in noting that the ALJ deviated from the doctors' opinions that Baez could perform medium work by further restricting Baez to light work. Tr. 28. Contrary to Baez's contention, the ALJ listed Baez's additional limitations in her light-work determination by stating Baez, "could occasionally kneel, crouch, climb ramps and stairs, balance, stoop, and crawl. She could occasionally work with hazardous machines with external moving parts and could occasionally work in high exposed places. [Baez] could work in a moderate noise intensity environment and she could not drive commercial motor vehicles." Tr. 28. Though these constitute additional restraints on light work, they are not equivalent to "sedentary work" as Baez contends. Such work involves lifting no more than 10 pounds at a time; occasionally lifting or carrying articles like docket files, ledgers, and small tools; and a certain amount of walking and standing. 20 CFR § 404.1567(a). The ALJ

determined Baez could do substantially all the activities listed under light work as required by the regulations with few exceptions. *See* 20 CFR § 404.1567(b). Though the ALJ's analysis of Drs. Rabelo and Nieves's evaluations is minimal, the ALJ deviated from those evaluations in determining Baez's RFC and adequately explained this decision by pointing to Baez's headaches and side effects from prescribed medication, both of which have been discussed above. Tr. 28. As such, the ALJ's analysis at Step Four is **AFFIRMED**.

**CONCLUSION**

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 16th day of December 2022.

S/ *Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge